## Fisher Estate

*Arthur E. Ashton,* for exceptant.
*John H. Cartwright,* contra.

HIPPLE, P. J., September 29, 1950.—On May 7, 1930, Ridgway National Bank was appointed guardian of the estate of Henry A. Fisher, a weak-minded person, as successor guardian to E. A. Sowers. Among the assets received from the former guardian was a first mortgage six percent bond due December 1, 1947, secured by property located on the Southeast corner of Sixteenth and Walnut Streets, Philadelphia, and known as the "C. Benton Cooper Bond".

On October 6, 1947, the bank filed a first and partial account in which it claimed credit and charged off the bond in question in the sum of $1,000. The representative of the Veterans Administration, as an interested party, filed exceptions to this credit of $1,000, alleging

that if the guardian had performed its proper duty as such no loss would have been occasioned by this investment.

The bank and the Veterans Administration filed a stipulation of facts setting forth, inter alia, that the bond in question was a coupon and not a registered bond, that at the time the bank, as guardian, received it from its predecessor guardian, it did not have a market value of $1,000, although it was carried on the books of the bank as an asset in that amount, that the president and trust officer of the bank on May 7, 1930, were the same person who continued in these capacities until his death in February 1942, that according to the records on file with the bank the first coupon on this bond was returned unpaid, that in February 1942, following the death of the president and trust officer, the trust officer who was then elected made inquiry as to the status of the bond and was advised on October 27, 1943, that in 1936 a corporation had been organized to acquire title to the property securing the bond in question under a reorganization plan in proceedings before the United States Court for the Eastern District of Pennsylvania, the plan being confirmed by that court on November 17, 1936. The reorganization plan provided that the holder of a $1,000 bond should receive one $800 face value of first mortgage six percent income bonds, two shares of $6 cumulative preferred stock and one share of common stock, and the right was reserved to the holders of the old bonds, including the one here in question, to exchange for the new securities until December 31, 1940, after which date the reorganized corporation would hold its assets free and clear of any claims of the old security holders, that the bank did not receive any notice, either oral or written, of this reorganization plan and had no knowledge thereof until it was so advised on October 27, 1943, following the bank's in-

quiry in February 1942; that the only notice given to holders of these bonds was a newspaper advertisement in newspapers published in Philadelphia, Pa., and because the bank was not a subscriber to any of these newspapers it did not have notice of the proposed reorganization plan, but was advised by a National bank examiner that this bond had been worthless since 1928, and, as a result of this advice, the bank charged off the bond as worthless and so notified the Veterans Administration.

Exceptant asks the court to surcharge the guardian with the value of the bond and in its brief takes the position that the guardian failed to exercise even ordinary prudence or diligence in ascertaining the value of the bond when it came into its possession on May 7, 1930.

From the stipulation of facts it appears that for a period of almost twelve years no inquiry was made by the bank from any source whatever as to the value of this bond or the desirability of retaining it as an asset of the ward's estate, and it was not until after there was no opportunity to realize upon the bond that the bank discovered the bond had no value.

It is not necessary to cite the many cases relating to the duties of trustees, guardians or other fiduciaries. The ordinary rule is that a fiduciary is under a duty to the beneficiary in administering a trust to exercise such care and skill as a man of ordinary prudence would exercise in dealing with his own property. Therefore the question is, did the guardian fail to exercise ordinary prudence in dealing with this particular asset?

It is well known that in 1930 there was a depression in the United States and that many real estate mortgage bonds were in default. The guardian, by merely writing to its correspondent bank in Philadelphia, upon its appointment as guardian in 1930, or through any other channels which were open to it, could have ascer-

tained very shortly after its appointment just what was the situation, what value the bond had and what should be done, if anything, to preserve the asset or whether it should be sold in the exercise of ordinary good judgment for whatever its market value then was. If this bond had been an investment of the bank itself, there is no doubt but that the bank would have kept itself informed as to its status. Because the guardian permitted a period of almost 12 years to elapse before any inquiries were made or any steps taken to protect this particular asset, the conclusion is inevitable that the guardian failed to exercise ordinary prudence in this regard, nor did it exercise such skill or care as it undoubtedly would have done had the bond been an investment of the bank itself.

"While a Court is always loth to surcharge a trustee (Guardian) . . . and exacts from him only reasonable and ordinary care in such matters, it will not do for a guardian to utterly neglect his duties in the care and management of his ward's estate. Ordinary prudence in this instance would have saved his ward's money, and we are not measuring his responsibility by any higher standard. It is not too much to say that, had this been his own money, in all probability it would not have been lost; and he ought not to have been less vigilant in his ward's interest than he would have been in his own": Webber's Estate, 133 Pa. 338. See also Komara's Estate, 311 Pa. 135; Beaver Trust Company's Appeal, 146 Pa. Superior Ct. 545-550.

The bank and the Veterans Administration filed a stipulation concerning the value of the Benton Cooper bond at various times and stating in substance: (1) The bond could have been exchanged for one $800 first mortgage income six percent bond, due in 1951, with two shares of $6 preferred stock and one share of common stock of the corporation known as the 1528 Walnut Street Building Corporation; (2) the closing date for

the exchange of the bond was December 31, 1940, subsequently extended to January 23, 1942; (3) the market value on December 31, 1940, of a unit consisting of one $800 bond, two shares of preferred stock and one share of common stock was $104 bid and $120 offered; (4) the market value on January 23, 1942, of this unit was $192; (5) the first mortgage six percent income bond of $800 was redeemed December 1, 1947, for $800, plus interest of 61.5 percent, or $492, less Pennsylvania corporate loans tax, or a net amount of $1,236.74; (6) the value of the $800 bond of January 23, 1942, the last date on which the exchange could have been made, was $800, plus six percent interest from December 1, 1936, until January 23, 1942, or $247.06, a total of $1,047.06, and the value of the $800 bond as of April 1, 1950, would be $1,236.74, together with whatever rate of interest the court should determine to be paid, if any, from December 1, 1947, to March 31, 1950.

While there are many cases in the books dealing with the duties of executors, trustees and guardians, relative to the estates in their charge, the statements in the various opinions "have necessarily been couched by the courts in somewhat vague phraseology, and usually with the admonition that each case must depend largely upon its own circumstances. General phrases culled from judicial opinions cannot be accepted, therefore, as sufficiently precise to enable a fiduciary to determine therefrom his exact responsibility under various conditions. There is no arbitrary or standardized formula which can be used as an inflexible measuring rod": Seamans' Estate, 333 Pa. 358-360. Or, as held in Shipley's Estate (No. 1), 337 Pa. 571-573, "As each case is in its circumstances sui generis, the decision must depend on the circumstances, and for this reason, seldom, if ever, is the decision in one case an absolutely controlling precedent when another arises".

While Seaman's Estate, supra, dealt with the failure of a guardian to convert nonlegal securities, there is an interesting discussion of the duties of a guardian with relation to the estate of his ward.

Therefore, in determining the date as of which the surcharge should be determined, all of the circumstances in this case must be taken into consideration. These are: (1) The appointment of the bank as guardian on May 7, 1930; (2) the fact that the first coupon forwarded by the guardian for collection was returned unpaid; (3) That no inquiry of any kind was made from any source whatever from May 7, 1930, or at least from the time the first coupon was returned unpaid until February 1942, subsequent to the date of exchange, concerning the status of the bond or what should be done to preserve it as an asset of the estate, although the channels of inquiry open to the bank were available; (4) because of such failure the bank did not have, but on the contrary, lost the opportunity of exchanging the bond for the securities of the 1528 Walnut Street Building Corporation; (5) That because of the lack of ordinary prudence and care in dealing with this asset, a loss in the face amount thereof has been incurred by the estate.

Under these circumstances, the loss must of necessity fall upon the guardian and the estate be reimbursed. According to the stipulation filed, the value of the $800 bond of 1528 Walnut Street Building Corporation, as of January 23, 1942, the last date on which the exchange could have been made, was $800 plus six percent interest from December 1, 1936, to January 23, 1942, or $247.06, making a total of $1,047.06.

The guardian will therefore be surcharged with this amount.

The second exception alleges that the guardian has charged itself with war risk insurance payments received by it from the Veterans Administration for the

benefit of its ward, in the amount of $3,000, approximately $1,000 of which was paid to the previous guardian and $2,000 paid to the bank as guardian, all of which is principal upon which no commission can be charged until the termination of the trust.

In the stipulation filed by the bank and the Veterans Administration, it is agreed that the war risk insurance received by the guardian from the Veterans Administration in an amount not in excess of $3,000 represents principal on which no commission can be charged until the guardian is discharged or the estate is terminated and that any commission charged on such amount, as shown in the first and partial account of the guardian will be refunded to the estate and be disclosed in the next account of the guardian.

### Decree

Now, September 29, 1950, the first exception to the account of Ridgway National Bank, guardian of the estate of Henry A. Fisher, a weak-minded person, is sustained, and the guardian is surcharged with, and is directed to pay to the estate of its ward, the sum of $1,047.06. The second exception is dismissed.